**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Trixie M. Torrez,<br><br>            Plaintiff,<br><br>vs.<br><br>Michael J. Astrue, Commissioner of Social Security,<br><br>            Defendant. | CIV 06-1178-PHX-MHB<br><br>**ORDER** |

Pending before the Court is Plaintiff Trixie M. Torrez's appeal from the Social Security Administration's final decision to deny her claim for Disability Insurance Benefits and Supplemental Security Income. After reviewing the administrative record and the arguments of the parties, the Court now issues the following ruling.

**I. PROCEDURAL HISTORY**

On June 9, 2003, Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income pursuant to Titles II and XVI of the Social Security Act, alleging disability since May 28, 2003. (Transcript of Administrative Record ("Tr.") at 60-62; 584-591.) Her applications were denied both initially and on reconsideration. (Tr. at 32-35; 42-45; 593-596; 598-601.) Following a timely request from Plaintiff (Tr. at 46-47), a hearing was held before Administrative Law Judge ("ALJ") Michael J. Cianci, Jr., on April 20, 2005. (Tr. at 602-639.) After taking the matter under advisement, the ALJ denied Plaintiff's claims on July 14, 2005, finding Plaintiff not disabled. (Tr. at 19-25.)

Plaintiff subsequently requested review of the ALJ's decision by the Appeals Council. (Tr. at 15.) On February 16, 2006, the Appeals Council denied Plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. at 6-8.) Plaintiff then commenced the instant action for judicial review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3). On May 10, 2007, Plaintiff moved for summary judgment. (Doc. #28.) Defendant filed a Cross-Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment on August 27, 2007. (Doc. #31.)

## II. STANDARD OF REVIEW

The Court must affirm the ALJ's findings if the findings are supported by substantial evidence and are free from reversible legal error. See Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998); Marcia v. Sullivan, 900 F.2d 172, 174 (9th Cir. 1990). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); see Reddick, 157 F.3d at 720.

In determining whether substantial evidence supports a decision, the Court considers the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion. See Reddick, 157 F.3d at 720. "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995); see Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989). "If the evidence can reasonably support either affirming or reversing the [Commissioner's] conclusion, the court may not substitute its judgment for that of the [Commissioner]." Reddick, 157 F.3d at 720-21.

## III. THE ALJ'S FINDINGS

In order to be eligible for disability or social security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

1  12 months." 42 U.S.C. § 423(d)(1)(A). An ALJ determines a claimant's eligibility for
2  benefits by following a five-step sequential evaluation:

3      (1)   determine whether the applicant is engaged in "substantial gainful activity";

4      (2)   determine whether the applicant has a medically severe impairment or combination of impairments;

5      (3)   determine whether the applicant's impairment equals one of a number of listed impairments that the Commissioner acknowledges as so severe as to preclude the applicant from engaging in substantial gainful activity;

6      (4)   if the applicant's impairment does not equal one of the listed impairments, determine whether the applicant is capable of performing his or her past relevant work;

7      (5)   if the applicant is not capable of performing his or her past relevant work, determine whether the applicant is able to perform other work in the national economy in view of his age, education, and work experience.

12  See Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (citing 20 C.F.R. § 404.1520). At the
13  fifth stage, the burden of proof shifts to the Commissioner to show that the claimant can
14  perform other substantial gainful work. See Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir.
15  1993).

16      The ALJ found that Plaintiff had not engaged in "substantial gainful activity" since
17  her alleged onset date. (Tr. at 24.) The ALJ determined that Plaintiff had the following
18  impairments: fibromyalgia, affective disorder, somatoform disorder, history of pancreatitis,
19  stable, mild obesity, and complaints of headaches. (Tr. at 24.) He considered these
20  impairments severe, but not severe enough to meet or medically equal any of the impairments
21  listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Commissioner's regulations. (Tr.
22  at 24.) Finding that Plaintiff was unable to perform any of her past relevant work, the ALJ
23  concluded that, notwithstanding her impairments, Plaintiff retained the residual functional
24  capacity to perform a significant range of medium work activity, but must avoid

confrontational roles, high production quotas, and high stress work environments.[1] (Tr. at 24.)

Based on the foregoing, the ALJ found that although Plaintiff is unable to perform her past relevant work and her limitations do not allow her to perform the full range of medium work, there are a significant number of jobs in the national economy that she could perform. (Tr. at 25.) Accordingly, he determined that Plaintiff was not disabled. (Tr. at 25.)

## IV. DISCUSSION

In her motion for summary judgment, Plaintiff contends that the ALJ (1) erred in determining her residual functional capacity and (2) failed to properly assess her credibility.

### A. Plaintiff's Residual Functional Capacity

Plaintiff argues that the ALJ erred in determining her residual functional capacity. Specifically, Plaintiff states the ALJ's residual functional capacity assessment is predicated on a factually incorrect consideration of medical evidence. Plaintiff contends that the ALJ failed to resolve differing medical opinions about the nature and extent of her limitations and did not identify the sources of his conclusions regarding Plaintiff's functional capabilities.

The ALJ, after conducting a review of the record, concluded that Plaintiff retained the residual functional capacity for a significant range of medium work activity. (Tr. at 21.) Specifically, he found that Plaintiff can sit, stand and walk for six hours a day, lift and carry twenty-five pounds frequently and fifty pounds occasionally, and occasionally climb, bend, crouch, and crawl. (Tr. at 21.) As a result of her mental impairments, the ALJ determined that Plaintiff cannot perform confrontational roles in the workplace or be expected to meet high production quotas. (Tr. at 21.) The ALJ concluded that Plaintiff requires a low-stress working environment. (Tr. at 21.)

In determining Plaintiff's residual functional capacity, the ALJ addressed Plaintiff's subjective allegations. (Tr. at 21.) Plaintiff testified that she stopped working because of

---

[1] "Residual functional capacity" is defined as the most a claimant can do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks. See 20 C.F.R. § 404.1545(a).

- 4 -

1 headaches and pain in the back, hips, legs, shoulders, elbows, hands, and neck. (Tr. at 21.)
2 Plaintiff reported poor sleep, poor short-term memory, dizziness, and fatigue. (Tr. at 21.)
3 As a result of her pain, Plaintiff stated that she cannot stand, walk a few steps, or lift a gallon
4 of milk. (Tr. at 21.) Further, Plaintiff presented at the hearing in a wheelchair, due to
5 fibromyalgia pain, and testified that she spends most of an average day lying down. (Tr. at
6 22.)

7 The ALJ found, however, that Plaintiff's allegations were not supported by the
8 objective record and appeared to be extremely exaggerated. (Tr. at 21.) The ALJ stated that
9 Plaintiff discontinued many narcotic pain medications under the supervision of her treating
10 physician, and although she was prescribed Valium by her treating physician, Plaintiff never
11 received formal mental health treatment. (Tr. at 21.) Further, he found no medical reason
12 in the objective record for Plaintiff to be in a wheelchair. (Tr. at 22.) Although Plaintiff
13 claimed that the wheelchair was prescribed two months before the hearing, the ALJ found
14 no evidence of any such prescription in the record. (Tr. at 22.)

15 Additionally, the ALJ noted that on January 1, 2004, Plaintiff was hospitalized for an
16 apparent opiate overdose. (Tr. at 21.) She was discharged on January 9, 2004, much
17 improved, with no more than mild joint pain. (Tr. at 21.) He found this fact inconsistent
18 with her complaints of severe and unremitting pain. (Tr. at 21.) In comparing Plaintiff's
19 subjective allegations with the objective medical record, the ALJ stated that the record
20 contained evidence of poor effort and malingering, which further undermined Plaintiff's
21 credibility. (Tr. at 21.)

22 The ALJ also considered the medical opinions of consultative physicians, Armando
23 A. Bencomo, Ph.D., and Malcolm McPhee, M.D.; Plaintiff's treating physician, Shawn M.
24 Sullivan, D.O.; and the State agency's reviewing physicians in determining Plaintiff's
25 residual functional capacity. (Tr. at 21-23.)

26 Dr. Bencomo, a clinical psychologist, conducted a consultative psychological
27 examination on October 23, 2003, and diagnosed the following: R/O (rule out) malingering
28 of cognitive impairment, R/O factitious disorder with mixed psychological and physical

symptoms, R/O cognitive disorder NOS (not otherwise specified) due to medication effects or as yet undiagnosed neurological disease, pain disorder due to medical and psychological factors, adjustment disorder with mixed emotions, histrionic and perfectionistic traits, fibromyalgia, recent right ankle injury, asthma, anemia, and psychosocial stressors – severe – including chronic pain, in process of divorcing, and loss of job and income. (Tr. at 21-22.)

Dr. Bencomo stated that Plaintiff put forth little effort on the mental status tasks and opined that her poor performance on cognitive testing was "totally inconsistent" with her ability to provide detailed descriptions of her personal history, feelings, symptoms, and work experiences. (Tr. at 22.) Dr. Bencomo continued finding that Plaintiff's extremely low score on memory testing was unusual, even in persons with a documented cognitive impairment. (Tr. at 22.) Taken together with her behavior on the other parts of the mental status examination, Dr. Bencomo concluded that Plaintiff grossly exaggerated her cognitive impairment. (Tr. at 22.) The ALJ gave Dr. Bencomo's opinion probative weight based upon the objective nature of the examination and because it was uncontroverted by the greater objective record. (Tr. at 22.)

Dr. McPhee, a board-certified specialist in physical medicine and rehabilitation, conducted a consultative physical examination on October 20, 2003. (Tr. at 22.) During his examination, Dr. McPhee observed that Plaintiff's gait was normal and that she was able to squat seventy-five percent of normal. (Tr. at 22.) He noted that range of motion tests showed no loss of motion in any of Plaintiff's joints; motor testing showed "give away" weakness; and reflexes were normal and sensation was intact. (Tr. at 22.) Dr. McPhee found that Plaintiff exhibited multiple tender points, but remarked that her reactions seemed somewhat out of proportion to the gentleness of the examination. (Tr. at 22.) Dr. McPhee's impression indicated fibromyalgia with multiple tender points, chronic headaches, chronic pain syndrome due to narcotics (including Oxycontin, Soma, and Imitrex), alleged memory loss, and depression. (Tr. at 22.) He opined that, based on Plaintiff's records and his examination, there was no reason that Plaintiff could not lift up to 50 pounds occasionally and 25 pounds frequently, stand/walk about six hours in an eight-hour workday, and sit for

six hours in an eight-hour workday. (Tr. at 22.) Dr. McPhee also determined that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, or crawl with no upper extremity or environmental limitations. (Tr. at 22.) The ALJ gave Dr. McPhee's opinion probative weight based upon Dr. McPhee's respective medical specialty, the objective nature of his examination, and his consistency with the greater objective record. (Tr. at 22.)

Dr. Sullivan, Plaintiff's treating physician of record, issued a medical source statement dated August 7, 2003. (Tr. at 23.) Dr. Sullivan found Plaintiff capable of lifting and carrying less than ten pounds at any time, standing and walking less than two hours a day, and sitting for one hour maximum per day. (Tr. at 23.) He also opined that Plaintiff could not climb, balance, stoop, kneel, or crawl, and only occasionally crouch. (Tr. at 23.) Dr. Sullivan stated that Plaintiff had limitations on handling and fingering, and had restrictions from exposure to heights, moving machinery, temperature extremes, chemicals, dust, and noise. (Tr. at 23.) In a letter dated April 15, 2005, Dr. Sullivan concluded that Plaintiff's fibromyalgia would never improve and would progress to chronic fatigue syndrome, and that Plaintiff is a "perfect candidate" for disability. (Tr. at 23.)

The ALJ found, however, that Plaintiff failed to meet the criteria for chronic fatigue syndrome. (Tr. at 23.) Further, the ALJ gave Dr. Sullivan's opinion less weight because it was not supported by the objective medical signs and laboratory findings of record. (Tr. at 23.) Additionally, the ALJ determined that Dr. Sullivan's statement that Plaintiff is a "perfect candidate" for disability bordered on addressing an issue ultimately reserved to the ALJ. (Tr. at 23.)

In his decision, the ALJ also considered the opinions of the state agency's reviewing physicians: Willis Warner, M.D., B.C. Szekely, Ph.D., James Campbell, M.D., Thomas Disney, M.D., and James Hopkins, M.D. (Tr. at 23.) In reference to these physicians' opinions, the ALJ summarily concluded that, "[t]he opinions of the State agency's reviewing physicians were also considered and were not given probative weight in this decision because

those physicians never examined the claimant and their opinions were inconsistent with the greater objective record (Exhibits 5F-7F and 10F-12F)." (Tr. at 23.)

### 1. Mental Impairments

With respect to the alleged mental impairments, Plaintiff asserts that the ALJ did not account for nor include in his residual functional capacity assessment the opinions of Dr. Bencomo and two secondary non-examining consultants, Dr. Szekely and Dr. Campbell. Plaintiff believes that the ALJ's designation of the non-exertional elements of Plaintiff's residual functional capacity is not warranted nor justified by the available expert opinions and it is not supported by substantial evidence.

Based on portions of Dr. Bencomo's opinion, the ALJ determined, "[a]s a result of her mental impairments, [Plaintiff] cannot perform confrontational roles in the workplace or be expected to meet high production quotas. The undersigned also gives [Plaintiff] the benefit of the doubt in finding that she also requires a low-stress work environment." (Tr. at 21.) The ALJ found evidence of poor effort and malingering, which he stated undermined Plaintiff's credibility. (Tr. at 21.) He further stated that Plaintiff grossly exaggerated her cognitive impairment and, accordingly, gave Dr. Bencomo's opinion probative weight based on the objective nature of the examination and because it was uncontroverted by the greater objective record. (Tr. at 22.) The Court finds, however, that the ALJ failed to address the balance of Dr. Bencomo's conclusions.

Specifically, Dr. Bencomo stated "[t]aken together with [Plaintiff's] behavior on the other parts of the mental status exam, it can be stated that she did in fact grossly exaggerate cognitive impairment." (Tr. at 143.) Dr. Bencomo continued, however, stating "[h]er malingering today does not prove that she has no cognitive impairment; nor does it mean that her physical complaints are not valid. All that can be said is that she was motivated to magnify and/or fabricate cognitive impairments today." (Tr. at 143.) Further, despite Plaintiff's exaggeration on part of the evaluation, Dr. Bencomo diagnosed a pain disorder due to medical and psychological factors, an adjustment disorder with mixed emotions, and

histrionic and perfectionist personalty traits. (Tr. at 144.) Additionally, Dr. Bencomo did not simply dismiss Plaintiff's complaints of memory loss, but observed as well that if a medical cause of Plaintiff's chronic pain was documented, "then it is apparent that her pain and suffering are magnified by psychological factors." (Tr. at 144.) Dr. Bencomo summarized his findings stating "[b]ecause today's cognitive screening tests were not a valid indication of [Plaintiff's] cognitive functioning, the question remains open as to whether [Plaintiff] has any real cognitive impairments – and why." (Tr. at 144.)

In the last portion of his opinion, Dr. Bencomo recommended the following:

1. Rely as much as possible on objective medical findings.
2. Obtain and review medical records from her treating physician(s) and from her treating psychologist.
3. Defer further psychometric assessment because it is not likely to be valid.
4. Review her medications for dosage and possible drug interactions that may be causing cognitive impairment.
5. Send a *Questionnaire to Third Party* to [Plaintiff's] most recent job supervisor.
6. Obtain a neurological exam with appropriate brain imaging studies as recommended by the [] neurologist.

(Tr. at. 144.) While most of Dr. Bencomo's "Statement of Work Related Activities – Mental" was "deferred due to lack of accurate assessment" he concluded that Plaintiff had a fair-to-poor capacity for behaving in an emotionally stable manner and a fair capacity for relating to co-workers, dealing with the public, interacting with supervisors, and dealing with work stresses. (Tr. at 145.)

The Court finds the ALJ's failure to address Dr. Bencomo's entire opinion constitutes error. The residual functional capacity assessment must be based on all of the relevant evidence in the record, including the effects of symptoms that are reasonably attributed to a medically determinable impairment. See Social Security Ruling 96-8p. Further, an ALJ may not rely on some portions of a report, while disregarding others. See Reddick, 157 F.3d at 720 (noting that the agency must review the record as a whole and cannot parcel out a quantum of evidence here and there); Switzer v. Heckler, 742 F.2d 382, 385-86 (7th Cir. 1984) ("[T]he Secretary's attempt to use only the portions [of a doctor's report] favorable to her position, while ignoring other parts, is improper."); Smith v. Bowen, 687 F.Supp. 902,

1  904 (S.D.N.Y. 1998) ("Although the ALJ is not required to reconcile every ambiguity and
2  inconsistency of medical testimony, he cannot pick and choose evidence that supports a
3  particular conclusion.").

4  The ALJ also summarily addressed the opinions Dr. Szekely and Dr. Campbell
5  stating, "[t]he opinions of the State agency's reviewing physicians were also considered and
6  were not given probative weight in this decision because those physicians never examined
7  the claimant and their opinions were inconsistent with the greater objective record ... ." (Tr.
8  at 23.) Although both doctors did not examine Plaintiff, the Court finds that both opinions
9  were in fact consistent with the opinion of Dr. Bencomo. As such, the Court finds that the
10 ALJ's failure to give appropriate weight to these opinions constitutes error.

11 Specifically, Dr. Szekely completed a Psychiatric Review Technique Form ("PRTF")
12 on October 30, 2003, and noted that there was a credibility issue related to Plaintiff's
13 memory complaints. (Tr. at 163.) However, he recognized the presence of an affective-
14 depressive disorder manifested by appetite and sleep disturbances, decreased energy, and
15 feelings of guilt or worthlessness (Tr. at 165), as well as a somatoform disorder, consisting
16 of a "medically determinable impairment ... that does not precisely satisfy" the primary
17 diagnostic criteria. (Tr. at 168.) Dr. Szekely acknowledged that Plaintiff, as a result of the
18 affective and somatoform disorders, was moderately limited in her activities of daily living,
19 ability to maintain social functioning, and capacity for maintaining concentration,
20 persistence, or pace. (Tr. at 172.)

21 Dr. Szekely also completed a Mental Residual Functional Capacity ("MRFC")
22 Assessment Form, noting that Plaintiff was "partly credible" for problems from a pain
23 disorder with psychological and medical factors, and an adjustment disorder with mixed
24 emotions. (Tr. at 160.)

25 Dr. Campbell, on January 29, 2004, completed a second PRTF that also disregarded
26 Plaintiff's complaints of cognitive dysfunction, but recognized the presence of appetite and
27 sleep disturbance, and feelings of guilt or worthlessness from an adjustment disorder with
28 mixed features, as well as histrionic and perfectionistic personality traits. (Tr. at 243-249.)

Dr. Campbell acknowledged the diagnosis of a pain disorder due to medical and psychological factors and noted that while the "extent of [Plaintiff's] pain [is] difficult to evaluate due [to the] exaggeration of a histrionic personality, ... she is diagnosed [with] fibromyalgia [and is] on various analgesics." (Tr. at 248.)

Dr. Campbell rated Plaintiff's restriction of activities of daily living and difficulty maintaining concentration, persistence, or pace as "Moderate," considering the affective, somatoform, and personality disorders. (Tr. at 252.) He also indicated that Plaintiff had "some moderate limitations in key areas because of anxiety, depression, decreased tolerance to stress [] associated [with] multiple complaints including pain associated [with] fibromyalgia." (Tr. at 238.) Dr. Campbell added that Plaintiff's capacity for "social interaction appears limited due to histrionic personality, some depression [and] chronic limitations from somatic problems including pain [and] headaches." (Tr. at 238-239.)

In summary, taking into account the ALJ's failure to address Dr. Bencomo's entire opinion and failure to afford the opinions of Dr. Szekely and Dr. Campbell due weight, the Court cannot conclude that the ALJ's residual functional capacity assessment with respect to Plaintiff's mental impairments is free from error or supported by substantial evidence.

**2.     Plaintiff's Fibromyalgia**

Regarding Plaintiff's fibromyalgia, Plaintiff argues that the ALJ failed to resolve specific discrepancies between the particularized descriptions of Plaintiff's functional capabilities and, instead, relied solely on Dr. McPhee's opinion – derived from one examination performed 18 months before the hearing. Plaintiff contends that the ALJ's rejection of information from Dr. Sullivan, and adoption of conflicting information from Dr. McPhee was legally insufficient.

Relying on the opinion of Dr. McPhee, the ALJ found that Plaintiff "can sit, stand and walk for six hours a day each, lift and carry twenty-five pounds frequently and fifty pounds occasionally, and occasionally climb, bend, crouch, and crawl." (Tr. at 21.) In assessing the evidence related to Plaintiff's fibromyalgia, the ALJ compared two statements by Dr. Sullivan, taken both before and after Plaintiff's alleged disability began, and a report by Dr.

1  McPhee, who examined Plaintiff approximately 18 months before Plaintiff's hearing. (Tr.
2  at 22-23.) However, during the 18-month gap between Dr. McPhee's examination on
3  October 20, 2003, and Plaintiff's hearing on April 20, 2005, Plaintiff saw Dr. Sullivan 24
4  times in 2004, and eight times from January through March of 2005. (Tr. at 206; 476-479;
5  471-475; 464-470; 460-463; 456-459; 451-455; 446-450; 441-445; 435-440; 429-434; 424-
6  428; 418-423; 412-417; 406-411; 400-405; 393-399; 386-392; 379-385; 372-378; 364-371;
7  357-363; 349-356; 341-348; 333-340; 319-325; 311-318; 303-310; 294-302; 286-293; 277-
8  285; 269-276.) In addition, during that time frame, Plaintiff was hospitalized nine times –
9  from November of 2003 through November of 2004. (Tr. at 176-204; 480-528; 562-570;
10 558-561, 579; 552-557, 578; 550-551; 538-541; 543-549; 535-537; 530-534.)

11       Although these medical records were available to the ALJ, the Court cannot conclude
12 that he considered and addressed them in weighing Dr. Sullivan's opinion. The ALJ briefly
13 mentioned only one hospital admission from January 1, 2004 through January 9, 2004 (Tr.
14 at 21), and failed to reconcile just how Plaintiff would be able to sustain regular, reliable
15 employment when her medical problems required her to visit her physician 32 times from
16 January of 2004 through March of 2005, and resulted in nine hospitalizations from
17 November of 2003 through November of 2004.

18       Indeed, right after this 18-month series of hospitalizations and visits to her physician,
19 Dr. Sullivan opined that he had "seen a steady decline in [Plaintiff's] functional capacity and
20 her activities of daily living" since being diagnosed with fibromyalgia. (Tr. at 529.) He
21 indicated that Plaintiff's condition would never improve, eventually would progress to
22 chronic fatigue syndrome, and produced profound fatigue and increased pain that took
23 several days to control, if she exceeded her limited capabilities. (Tr. at 529.) Dr. Sullivan
24 instructed that fibromyalgia was "a common form of generalized muscular pain and fatigue"
25 which symptoms could "be compounded by stress," and concluded that it was his
26 "professional opinion that [Plaintiff] is a perfect candidate for permanent, total disability."
27 (Tr. at 529.)

28

1    "The medical opinion of a claimant's treating physician is entitled to 'special
2 weight.'" Rodriguez v. Bowen, 876 F.2d 759, 761 (9th Cir. 1989) (quoting Embrey v.
3 Bowen, 849 F.2d 418, 421 (9th Cir. 1988)). "The rationale for giving the treating physician's
4 opinion special weight is that he is employed to cure and has a greater opportunity to know
5 and observe the patient as an individual." McCallister v. Sullivan, 888 F.2d 599, 602 (9th Cir.
6 1989). An ALJ may reject "the treating physician's opinion, but only by setting forth
7 'specific, legitimate reasons for doing so, and this decision must itself be based on substantial
8 evidence.'" Rodriguez, 876 F.2d at 762 (quoting Cotton v. Bowen, 799 F.2d 1403, 1408 (9th
9 Cir. 1986)).

10   As previously stated, the ALJ gave Dr. Sullivan's opinion less weight because it was
11 not supported by the objective medical signs and laboratory findings of record. (Tr. at 23.)
12 However, in light of the substantial documentation of medical evidence during the 18-month
13 time period between Dr. McPhee's examination and Plaintiff's hearing, it is unclear to the
14 Court just how the ALJ considered and addressed this medical evidence in finding that Dr.
15 Sullivan's opinion was not supported by objective medical signs and laboratory findings of
16 record.

17   "'The ALJ must do more than offer his own conclusions. He must set forth his own
18 interpretations and explain why they, rather than [Dr. Sullivan's], are correct.'" Regennitter
19 v. Comm'r of the Soc. Sec. Admin., 166 F.3d 1294, 1298-99 (9th Cir. 1999) (citation
20 omitted); see Embrey, 849 F.2d at 422 ("[I]t is incumbent on the ALJ to provide detailed,
21 reasoned, and legitimate rationales for disregarding the physicians' findings."). Accordingly,
22 the Court finds that the ALJ's decision with respect to Plaintiff's fibromyalgia is not
23 supported by substantial evidence.

24   **B.    Plaintiff's Credibility**

25   Plaintiff alleges that the ALJ failed to properly assess her credibility. Specifically,
26 Plaintiff claims the ALJ committed material errors in his determination that Plaintiff did not
27 credibly describe her pain symptoms and consequent functional limitations.

28

1      As the Court has noted, the ALJ is responsible for determining credibility. See
2 Magallanes, 881 F.2d at 750. When deciding whether to accept the subjective testimony of
3 a claimant, the ALJ must perform a two-part analysis. In the first part, the claimant must (1)
4 produce objective medical evidence of one or more impairments; and (2) show that the
5 impairment or combination of impairments could reasonably be expected to produce some
6 degree of symptom. See Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996). The
7 claimant is not required to produce objective medical evidence of the symptom itself, the
8 severity of the symptom, or the causal relationship between the medically determinable
9 impairment and the symptom. See id. at 1282. Rather, the claimant is only required to show
10 that the impairment could reasonably have caused some degree of the symptom. See id.

11      In the second stage of the analysis, the ALJ must assess the credibility of the
12 claimant's testimony regarding the severity of the symptoms. If there is no affirmative
13 evidence of malingering, the ALJ may reject the claimant's testimony only if the ALJ makes
14 specific findings, stating clear and convincing reasons for the rejection. See id. at 1284. In
15 evaluating the credibility of a claimant's testimony, evidence of claimant's daily activities,
16 type and dosage of pain medication, treatment received, and the ALJ's own recorded
17 observations of the claimant during the hearing are all relevant as part of the ALJ's overall
18 assessment of the claimant. See Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991).

19      In concluding that Plaintiff's allegations were not supported by the objective record
20 and appeared to be extremely exaggerated, the ALJ found that Plaintiff discontinued several
21 narcotic pain medications under the supervision of her treating physician, and although she
22 was prescribed Valium by her treating physician, Plaintiff never received formal mental
23 health treatment. (Tr. at 21.) Further, he determined that there was no medical reason in the
24 objective record for Plaintiff to be in a wheelchair. (Tr. at 22.) Although Plaintiff claimed
25 that the wheelchair was prescribed two months before the hearing, the ALJ failed to find
26 evidence of any such prescription in the record. (Tr. at 22.)

27      Additionally, the ALJ stated that on January 1, 2004, Plaintiff was hospitalized for an
28 apparent opiate overdose. (Tr. at 21.) She was discharged on January 9, 2004, much

improved, with no more than mild joint pain. (Tr. at 21.) He found this fact inconsistent with her complaints of severe and unremitting pain. (Tr. at 21.) In contrasting Plaintiff's subjective allegations with the objective medical record, the ALJ found evidence of poor effort and malingering, which undermined Plaintiff's credibility. (Tr. at 21.)

The ALJ offers a series of reasons why he determined that Plaintiff was not credible in her description of symptoms and functional limitations. However, in light of the Court finding error in the ALJ's failure to properly address Dr. Bencomo's entire opinion, afford due weight to the opinions of Dr. Szekely and Dr. Campbell, and consider and address the substantial documentation of medical evidence in weighing Dr. Sullivan's opinion, the Court cannot conclude that the ALJ's credibility determination is supported by substantial evidence.

## V. CONCLUSION

The Court finds that the ALJ concluded that Plaintiff was disabled without fully addressing the opinion of Dr. Bencomo or giving due weight to the opinions of Dr. Szekely and Dr. Campbell. Further, the ALJ failed to properly consider and address Plaintiff's medical records during the 18-month time period between Dr. McPhee's examination and the hearing in assessing Dr. Sullivan's opinion. Lastly, the ALJ failed to take any of these factors into account in determining that Plaintiff's allegations were not supported by the objective medical record. Accordingly, the decision of the ALJ will be reversed.

Having decided to vacate the ALJ's decision, the Court has the discretion to remand the case for further proceedings or for an award benefits. See Reddick, 157 F.3d at 728. The Ninth Circuit has held that a remand for an award of benefits is appropriate in cases where there are no outstanding issues that must be resolved before a proper determination can be made and it is clear from the record that the ALJ would be required to award benefits. See, e.g., Varney v. Secretary of HHS, 859 F.2d 1396 (9th Cir. 1988); Smolen, 80 F.3d at 1292. Because the Court cannot, on the record before it, conclude that an award of benefits is required, the Court will remand for further proceedings consistent with this Order.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. #28) is **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant's Cross-Motion for Summary Judgment (Doc. #31) is **DENIED**;

**IT IS FURTHER ORDERED** that Defendant's administrative decision denying benefits is reversed and that this matter is remanded to Defendant for further proceedings consistent with this Order.

DATED this 18th day of March, 2008.

*Michelle H. Burns*
Michelle H. Burns
United States Magistrate Judge